# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| KAREN MCAFEE, | : | Case No. 3:16-cv-00372 |
| --- | --- | --- |
| Plaintiff, | : | District Judge Thomas M. Rose |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| NANCY A. BERRYHILL, Commissioner of the Social Security Administration, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I. Introduction

Plaintiff Karen McAfee has lived with anxiety and depression for many years. She applied for Disability Insurance Benefits in December 2009, asserting that these health problems constitute a disability, which began on July 1, 2006. An Administrative Law Judge (ALJ) denied Plaintiff's application in 2012. She then brought a previous case in this Court, challenging the ALJ's decision. The parties eventually agreed to return the matter (by remand) to the Social Security Administration.

On remand, the Social Security Administration's Appeals Counsel assigned the matter to a different ALJ, Elizabeth A. Motta, who found that Plaintiff was not under a benefits-qualifying disability. Plaintiff brings the present case challenging ALJ Motta's

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

decision on various grounds, including that the ALJ erred in weighing the opinions of her treating psychiatrist, Dr. Moody; the opinions of her mental-health case worker, Julie Burns; and the opinions of the state-agency record-reviewing psychologist, Dr. Hoffman. The Commissioner contends that the ALJ properly evaluated the evidence.

II.     **Background**

Plaintiff was 52 years old on the date (in September 2011) she was last insured for Disability Insurance Benefits. She is therefore considered "a person closely approaching advanced age" under social security law. In June 2014, she turned age 55 and thus became "a person of advanced age" under social security law. She has a high school education plus three years of college. She worked in the past as an appointment clerk, data entry clerk, order clerk, and residence supervisor.

Plaintiff testified that in late 2009 and early 2010, she attempted job training through Goodwill. (Doc. #6, *PageID* #s 65-66). She was unable to complete the program because of anxiety attacks. *Id*. at 66. These attacks occurred at least 2 to 3 times per month and last for an hour or more. She shakes, cries, and feels afraid. *Id*. To get through an anxiety attack, she needed to go somewhere quiet and lie down. (Doc. # 7, *PageID* #911). After a panic attack, she was left without energy and slept for 2 to 3 hours. (Doc. #6, *PageID* #s 66, 68). Her symptoms fluctuate in severity in response to stress. *Id*. at 73-74. Plaintiff's depression made her feel tired all the time and suppresses her appetite. *Id*. at 68-69. She cries often, many times for no apparent reason. *Id*. at 71. She explained: "I'm not able to … [do] the things that normally I would do—getting up, eating, getting dressed … I'm not able to do that. I don't want to eat, I don't want to get

2

dressed, I don't want to wash up, and that really—not interested in anything. It's a real heavy feeling." *Id*. at 69.

Plaintiff testified that she experiences depressive periods. *Id*.; *see* Doc. #7, *PageID* #s 917-18. These depressive periods can last for a week or more and stress aggravated them. *Id*. She avoided shopping, driving, or household chores during her bad depression/anxiety periods. Even getting out of bed or getting dressed was difficult. She explained that she had difficulty attending to household chores even on her good days and needed to share cooking duties with other family members. When she was having a good day, she will try to fix enough meals to last her for several days. *Id*. She had a hard time attending to household bills secondary to her depression because the bills stressed her out and caused her to "shut down." (Doc. #6, *PageID* # 76). This led to Plaintiff receiving shutoff notices from utility providers and she incurred late fees. She tried to go to church, but she frequently missed services because of her mental health symptoms. (Doc. #7, *PageID* #915).

The administrative record contains many medical records plus opinions from Plaintiff's treating and non-treating medical sources. With two exceptions—Dr. Moody's and Dr. Hoffman's opinions—a detailed description of those records and opinions is unnecessary because the undersigned has reviewed the entire administrative record, because Plaintiff's counsel has accurately summarized the pertinent records, and because the Commissioner defers to the ALJ's discussion of the evidence. (Doc. #9, PageID #s 1254-61; Doc. #12, *PageID* #1279).

3

In May 2009, psychologist Dr. Hoffman reviewed the record for the state agency. She opined that Plaintiff was not significantly limited or moderately in her abilities to perform mental-work activities. She found that Plaintiff was partly credible. She opined that Plaintiff "is capable of performing simple and routine tasks in an environment in which tasks remain fairly static, where strict production demands are not enforced, where contact with others is routine and superficial. She would do best if contact with the public is not an integral part of her job, but she can interact with the public for routine and personal needs." (Doc. #6, *PageID* #293). At the time Dr. Hoffman formed her opinions, Plaintiff's long-term treating psychiatrist Dr. Moody's opinions were not available.

Dr. Moody opined in June 2010 that Plaintiff's mood fluctuates. She could maintain a normal mood for weeks up to a few months, but she "has a tendency to have episodes of severe depression during which she is crying , poorly focused, lethargic, avolitional, irritable (sometimes to the point of hostility), can't sleep, doesn't care for herself, feels helpless [and] hopeless." (Doc. #6, *PageID* #658). She did not have overt signs of a thought disorder. Under normal circumstances, her cognitive functioning was normal. She has at least average intelligence. Dr. Moody noted, "When depressed [and] anxious [she] has poor concentration and problem solving ability." *Id*.

Dr. Moody opined that Plaintiff has a limited ability to adapt and "seems to have [a] pattern of decompensating quickly under stress and becoming incapable of functioning even at basic level of self care (taking care of ADLs [activities of daily living]). Stressors include divorce, grandmother's death, care of elderly mother." *Id*. at

4

659. Dr. Moody believed that Plaintiff was capable of handling a job but her pattern of decompensation "indicates an inability to maintain normal mood [and] functioning on a sustained basis and would make it difficult [for her] to maintain employment." *Id*.

### III. Disability Defined and ALJ Motta's Decision

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); see 42 U.S.C. § 423(a)(1)(D). The term "disability" refers to "any medically determinable physical or mental impairment" that precludes an applicant for benefits from performing a significant paid job—i.e., "substantial gainful activity." 42 U.S.C. § 423(d)(1)(A); *see Bowen*, 476 U.S. at 469-70. As noted previously, it fell to ALJ Motto evaluate the evidence connected to Plaintiff's application for benefits. She did so by considering each of the five sequential steps described by regulation. See 20 C.F.R. § 404.1520(a)(4). Moving through some initial findings, the ALJ reached steps two and three where she found that through the date Plaintiff was last insured, her severe impairments—"affective (depressive disorder) and generalized anxiety disorder"—did not automatically qualify her for benefits. (Doc. #7, *PageID* #s 875-86). At step 4, the ALJ found that Plaintiff could no longer perform her past relevant work, and the most she could do despite her limitations (her residual functional capacity, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002)), at all exertional levels subject to the following limitations: Simple, repetitive tasks; low-stress work with no strict production quotas or fast pace and only routine work with few changes in work setting; no contact with the public as part of job duties; only

occasional contact with co-workers and supervisors; no teamwork or "over the shoulder" supervision; no exposure to hazards, such as dangerous machinery or unprotected heights; no climbing ladders, ropes, or scaffolds. (Doc. #7, *PageID* #886). These abilities and limitations, together with the ALJ's other findings, led to the conclusion that Plaintiff was not under a benefits-qualifying disability.

## IV.  Standard of Review

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting W*arner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance …." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722. The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria— may result in reversal even when the record contains substantial evidence supporting the

6

ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part Bowen, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V. Discussion

The Social Security Administration's instructions to ALJ Motta on remand required her to consider Dr. Moody's opinions, "expressly accounting for the episodic nature of the claimant's mental impairments as described by Dr. Moody and evidenced elsewhere in the record, including the claimant's testimony." (Doc. #7, *PageID* #964).

Plaintiff contends that ALJ Motta's evaluation of Dr. Moody's opinions appears to incorrectly view "decompensation as equivalent to or otherwise documentable only by inpatient psychiatric hospitalization." (Doc. #9, *PageID* #1263). The Commissioner contends that Plaintiff has failed to cite any evidence showing, consistent with Dr. Moody's opinion, that her decompensation caused her to be incapable of functioning at a basic level of self-care.

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians,

7

commonly known as the treating physician rule." *Rogers*, 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id.* (quoting Soc. Sec. Rul. No. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id.* Substantial evidence must support the reasons provided by the ALJ. *Id.*

ALJ Motta addressed Dr. Moody's opinion about Plaintiff's decompensation as follow:

> In light of the evidence as a whole, no controlling or deferential weight is given the statement by Dr. Moody with regard to easy compensation (a significant factor in the remand and this statement is at 15F at 2 [*PageID* #659). However, other than the period of decompensation for seemingly a few weeks in June to July 2006…, associated with a major life event, that is, the abrupt break up of her marriage, there were no further episodes of decompensation at the time of Dr. Moody's opinion in July 2010. Dr. Moody's reference to a "pattern of decompensating quickly under stress" is not born out by either her records or any other evidence relevant to the time frame of this decision. The claimant was hospitalized in 2011 … for a week related to the stressors of being the primary caregiver for her mother. This was not of "extended duration" and it being five years after the prior decompensation can hardly be seen to show a pattern to support Dr. Moody's opinion even in hindsight. Dr. Moody's reference to during decompensation periods not being able to function at even a basic level of self-care flies in the face of the fact that she was the care giver for her grandmother until she died and her mother as well, and Dr. Moody even states this was due to situational factors including "care of elderly mother." The majority of Dr. Moody's statements suggest significant capacity for work-related functioning….

(Doc. #7, *PageID* #882). ALJ Motta concluded, "Overall, substantial weight is given [Dr. Moody's] opinions with the exception of her opinion about Plaintiff's decompensation." *Id*.

Plaintiff is correct that the ALJ erred by appearing to require Plaintiff's medical records to contain evidence of her psychiatric hospitalizations in order to show that she experienced decompensation. This is contrary to the Social Security Administration's own definition. The regulations provide:

> *Episodes of decompensation* are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing daily activities, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would

9

> ordinarily require treatment or a less stressful situation (or a combination of the two)….

20 C.F.R. Pt. 404, Subpart P, App. 1, 12.00(c)(4) (April 1, 2015) (italics in original). As is obvious from its plain language, this definition does not mention or allude to psychiatric hospitalization as a requirement or element needed to show a person has undergone a period of decompensation. It sweeps much broader than that. The ALJ therefore erred by searching Plaintiff's medical records for periods of psychiatric hospitalizations before Dr. Moody issued her opinion and by understanding the absence of multiple hospitalizations to indicate Plaintiff did not experience episodes of decompensation. Although the regulations further explain that episodes of decompensation may be inferred from hospitalizations, *see Larson v. Astrue*, 615 F.3d 744, 750 (7th Cir. 2010), those episodes may also be inferred from "other relevant information about the existence, severity, and duration of the episode." 20 C.F.R. Pt. 404, Subpart P, App. 1, 12.00(c)(4). The ALJ therefore erred to the extent requiring evidence showing that Plaintiff underwent psychiatric hospitalizations before the date of Dr. Moody's decision in order to confirm Dr. Moody's opinion about Plaintiff's patterns of decompensation.

Similarly, the Social Security Administration's Program Operations Manual Systems (POMS) confirms the ALJ's mistaken approach to equating decompensation with psychiatric hospitalizations. This is seen in its explanation, consistent with the regulations, that decompensation "refers to failure to adapt to stressful circumstances which cause the individual either to withdraw from that situation or to experience

exacerbation of signs and symptoms or experience deterioration in previously attained adaptive skills." POMS DI 22511.005(D). The Commissioner notes that the examples of decompensation set forth in this POMS section include "hospitalizations, placement in a halfway house or a highly structured and directed household, etc." *Id.* This again reflects the language of the regulations and does not foreclose the possibility that decompensation may be inferred from other relevant evidence. 20 C.F.R. Pt. 404, Subpart P, App. 1, 12.00(c)(4); *cf. Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) ("Concluding that the claimant 'is not a raving maniac who needs to be locked up' is a far cry from concluding that she suffers no limits on her ability to function." (citation omitted)).

The foregoing distinction between the term decompensation as the regulations definite it and as the ALJ understood it undermines the ALJ's analysis of Dr. Moody's opinion in at least two ways. First, it invalidates the ALJ's election to reject Dr. Moody's "pattern of decompensation" opinion as inconsistent with the number of times Plaintiff's mental impairments have required inpatient hospitalizations. Second, it belies the ALJ's finding that the pattern discussed by Dr. Moody "is not born out by either her records or any other evidence relevant to the timeframe of this decision." (Doc. #7, *PageID* #882). Plaintiff's treatment records indicate periodic increases in her symptomatology and decreases in her functioning related to situational stressors as well as the ebb and flow of her depression/anxiety. Those records support Dr. Moody's

opinion regarding Plaintiff's "pattern of decompensation."[2]  *See id*. at 324, 340, 463, 533, 574, 576, 834.

Relatedly, the ALJ concludes that Dr. Moody's opinion regarding decompensation "flies in the face" of the fact that Plaintiff, at different times, provided care for her ailing mother and grandmother. *Id*. at 882.  This conclusion is confusing as elsewhere in her decision the ALJ acknowledges that the responsibility on Plaintiff to care for her mother and grandmother was a source of significant stress for her that exacerbated her mental health symptoms.[3]  *See id*. at 881-82.  The fact that Plaintiff's symptoms improve enough at times for her to care for her mother and grandmother do not lead to a reasonable conclusion that she can return to work given the fluctuating nature of her mental health problems.  *Cf. Holohan v. Massanari,* 246 F.3d 1195, 1205 (9th Cir. 2001) ("That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace.");  *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) ("The administrative law judge's casual equating of household work to work in the labor market cannot stand.").

Substantial evidence also fails to support the ALJ's finding that "the majority of Dr. Moody's statements suggest significant capacity for work related functioning." *Id*. at

---

[2] Plaintiff correctly notes that the deterioration of her condition to such a profound degree as to require hospitalizations, even on the few occasions it occurred, tends to support rather than detract from Dr. Moody's assessment.

[3] The ALJ wrote, "The claimant's allegations of stress due to the responsibility of caring for both her grandmother and her mother are noted throughout the record." *Id*. at 881.

882. This inaccurately read Dr. Moody's interrogatory responses. Dr. Moody wrote, for instance:

> Mood fluctuates. Can maintain normal mood for weeks to few months but has tendency to have episodes of severe depression during which she is crying, poorly focused, lethargic, avolitional, irritable (sometimes to the point of hostility), can't sleep, doesn't care for self, feels hopeless and helpless.

*Id*. at 658. The ALJ continued, "When depressed and anxious has poor concentration and problem solving ability." *Id*. "At times is capable of handling a job but her pattern indicates an inability to maintain normal mood [and] functioning on a sustained basis and would make it difficult to maintain employment." *Id.* at 659. The ALJ's unsupported finding that Dr. Moody believed Plaintiff had a "significant capacity for work related functioning" further undermines her analysis. It also throws into question whether or not she substantively and meaningfully considered all portions of the treating psychiatrist's assessment. This is particularly troublesome considering the role the previous ALJ's incomplete weighing of Dr. Moody's opinion played in the need to remand the matter to the Social Security Administration. *See id*. at 963-64, 971.

The Commissioner contends that the ALJ provided good reasons for not crediting Dr. Moody's opinion by finding Dr. Moody's treatment records show improvement in Plaintiff's condition when she takes medication as prescribed. The ALJ, however, did not engage in the required analysis for considering a claimant's failure to follow prescribed treatment. *See* Soc. Sec. R. 82-59, 1982 WL 31384 (1982). Without such analysis, Plaintiff's occasional failure to take prescribed medication was at best a dubious reason for discounting Dr. Moody's opinions. *See Spiva v. Astrue*, 628 F.3d 346, 351

(7th Cir. 2010) ("The administrative law judge's reference to Spiva's failing to take his medications ignores one of the most serious problems in the treatment of mental illness— the difficulty of keeping patients on their medications.").

The Commissioner also contends that the ALJ properly rejected Dr. Moody's opinions because she assigned Plaintiff a GAF (Global Assessment of Functioning) of 60, which indicates moderate symptoms. But, at the time of ALJ Motta's decision in May 2016, the use of GAF was no longer recognized by the American Psychiatric Association as a valid psychiatric measurement tool. *See* Diagnostic and Statistical Manual of Mental Disorders at p. 16 (5th ed. 2013) (DSM-V) (eliminating GAF upon the recommendation "that the GAF be dropped from [DSM-V] for several reasons, including its conceptual lack of clarity ... and questionable psychometrics in routine practice"). Consequently, Plaintiff's GAF ratings were not reasonably probative evidence in conflict with Dr. Moody's opinions, *see Barnett v. Colvin*, 2015 WL 471243, at *11 (S.D. Ohio 2015)[4] (quoting *Oliver v. Comm'r of Soc. Sec.*, 415 F. App'x 681, 684 (6th Cir. 2011) ("'A GAF score is thus not dispositive of anything in and of itself ....'")).[5]

The Commissioner further argues that the ALJ properly discounted Dr. Moody's opinions because Plaintiff was attempting to find work and was engaged in vocational

---

[4] R&R adopted, 2015 WL 777646 (Feb. 24, 2015).

[5] In a 2016 case, *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 836 (6th Cir. 2016), the Sixth Circuit continued to acknowledge the GAF's usefulness to ALJs. *Miller*, however, relied on a case from 2012, *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002), which was decided well before the DSM V dropped the GAF scale in 2015. Additionally, *Miller* evaluated an ALJ's decision in 2011 before the DSM V eliminated the GAF scale in 2015. And, *Miller* is silent about whether ALJs may use GAF scores to discount a treating psychiatrist's opinions after DSM V dropped the GAF scale. *Miller* is therefore distinguished from the present case, which addressed ALJ's Motta's May 2016 decision, after the effective date of DSM V.

training.  Yet, Plaintiff was not able to work full-time when she attempted to do so after vocational training due to exacerbation of her symptoms.  And, her participation in vocational training and her attempt to find work are consistent with, and do not undermine, Dr. Moody's opinions about Plaintiff's decompensation and fluctuating ability to function.  *Cf.* 20 C.F.R. §404.1574(c) ("Ordinarily, work you have done will not show that you are able to do substantial gainful activity if, after you worked for a period of 6 months or less, your impairment forced you to stop working ….").

Another wholly different problem infects the ALJ's consideration of Dr. Moody's opinions.  The ALJ did not provide a straightforward weighing of Dr. Moody's opinion first under the treating physician rule, and then, if needed, under the remaining factors of the regulations.  *See id*. at 879-82; *see also Gayheart,* 710 F.3d at 376.  At best, she incorrectly combined the factors applicable under the treating physician rule with the remaining factors, such as supportability and consistency.  Perhaps the ALJ was misdirected into focusing on the Appeals Council's remand order, which instructed her to consider Dr. Moody's opinion about decompensation.  Regardless of the reason, the ALJ seemingly searched the record for reasons not to credit Dr. Moody's opinions rather than considering her opinions under the required two-step analysis.  *See* 20 C.F.R. 404.1527(c)(2)-(5); *see also Rogers*, 486 F.3dat 242 (in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding."); *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009).  This constituted a failure to apply the correct legal criteria.

15

Turning to the ALJ's consideration the opinions of Dr. Hoffman, a state agency consulting psychologist. The Appeals Council instructed ALJ Motta to evaluate Dr. Hoffman's opinions on remand. (Doc. #7, *PageID* #964). ALJ Motta placed "great weight" on Dr. Hoffman's opinions particularly with regard to the consultant's appraisal of Plaintiff's social limitations. *See id*. at 882-83, 887). However, the ALJ's residual functional capacity finding does not mirror all of the limitations from Dr. Hoffman's credited opinion. For instance, Dr. Hoffman restricted Plaintiff to "fairly static" work tasks where contact with others is "routine and superficial." (Doc. #6, *PageID* # 293). While an ALJ is not necessarily obligated to embrace any particular medical opinion verbatim, "the ALJ must meaningfully explain why certain limitations are not included in the RFC determination—especially when such limitations are set forth in opinions the ALJ weighs favorably." *Howard v. Comm'r of Soc. Sec*., Case No. 3:14-cv-364, 1996 WL 8213614, at *4 (S.D. Ohio 2016) R &R adopted, 1996 WL 99114 (January 7, 2016) (Rice, D.J.; Newman, M.J.) (citations omitted). This further undermines the ALJ's analysis, particularly considering the role of Dr. Hoffman's opinions in the prior remand.[6]

## VI. Remand For Benefits Is Warranted

Remand is warranted when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand due to an ALJ's failure to follow the regulations might arise, for example, when the ALJ failed to provide "good reasons" for rejecting a

---

[6] In light of the above review, an analysis of the parties' remaining arguments is unwarranted.

treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff's credibility lacking, *Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted "only where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking." *Felisky*, 35 F.3d at 1041 (quoting *Faucher v. Sec'y of Health & Humans Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)).

In the present case, the evidence of record establishes that a remand for award of benefits is warranted because the record contains overwhelming evidence, or strong evidence while contrary evidence is lacking, that Plaintiff is under a disability. Such evidence includes, but is not limited to, the opinions provided by Plaintiff's long-term treating psychiatrist Dr. Moody combined with the treatment records from South Community Behavioral Health. Additionally, there is no reasonable justification to delay an award of benefits while the matter is remanded for further proceedings for the third time when her application has been pending for seven and one-half years.

Accordingly, Plaintiff is entitled to receive Disability Insurance Benefits based on the application she filed on December 12, 2009.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be reversed and this case be remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for payment of benefits based on Plaintiff's December 12, 2009 application for Disability Insurance Benefits; and

2. The case be terminated on the docket of this Court.


August 9, 2017                        *s/Sharon L. Ovington*
                                         Sharon L. Ovington
                                         United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).